Filed 11/22/16

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

THE PEOPLE,

     Plaintiff and Respondent,

v.

PHILIP RAYMOND MEJIA,

     Defendant and Appellant.

E062962

(Super.Ct.No. FVI1302657)

OPINION

APPEAL from the Superior Court of San Bernardino County. Debra Harris, Judge. Affirmed with directions.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts 1 through 3 of the Legal Analysis.

1

Defendant and appellant Philip Raymond Mejia appeals his conviction for torture, spousal rape, spousal abuse, and criminal threats. We reject his contention that the court should have conducted a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) based on defendant's statements during a hearing on his request to represent himself and his contentions concerning the improper admission of evidence. We agree, however, that the trial court erred in imposing an unstayed sentence on count 3. Accordingly, we will remand the matter with directions to stay imposition of that sentence.

PROCEDURAL HISTORY

Defendant was charged with one count of torture (Pen. Code, § 206; count 1);[1] one count of spousal rape with tying and binding (§ 262, subd. (a)(1); count 2); one count of corporal injury to a spouse (§ 273.5, subd. (a); count 3); and one count of criminal threats (§ 422; count 4). As to all four counts, the information alleged that defendant administered methamphetamine to the victim in the commission of the offenses.

A jury returned guilty verdicts on all four counts. It found the allegation of tying and binding true, but found the allegation of administration of methamphetamine not true as to all counts.

The trial court imposed the upper term of four years in state prison on count 3, with a consecutive term of eight months on count 4. On count 2, the court imposed a

---

[1] All further statutory citations refer to the Penal Code, unless another code is specified.

term of 15 years to life, and on count 1, it imposed a term of seven years to life in state prison. Defendant filed a timely notice of appeal.

FACTS

Defendant and the victim met when she was 15 years old. When she was 18 or 19 years old, they were married. By the time the victim was 20 years old, she had three children. She and defendant used methamphetamine together but stopped when the third child was born. From the beginning, defendant said "mean things" to the victim and would sometimes hit her. In approximately March 2013, when defendant lost his job, his abusiveness slowly got worse. On one occasion, defendant burned her leg with a methamphetamine pipe when she said she did not want to smoke the drug. On another occasion, he hit her all over her body with a wooden flute. Other times, he hit her on her head with his hands.

The victim suspected that defendant had cheated on her, but she "couldn't question what he was doing." Talking back to defendant or not wanting to do what he asked would "set him off." In order to start a conversation about infidelity, she told him, untruthfully, that she had cheated on him. He was angry and talked about punishing her. He said there were "consequences." On other occasions, defendant would handcuff her to the bed frame and make her lie on the floor. They had occasionally used the handcuffs during sex, for "fun purposes," but after that, it "wasn't fun anymore." Defendant would sometimes leave her handcuffed to the bed for hours or days at a time. While she was handcuffed, she was not able to eat or drink water. Defendant would "sometimes" allow

3

her to go to the bathroom, but sometimes she was forced to "go" on herself. The handcuffs sometimes cut or bruised her wrists.

At some point, defendant began to video record their sexual activity. The victim could not remember why it started, but it was after defendant lost his job. She was "kind of okay" with it in the beginning, but sometimes she would get embarrassed and push the cell phone or camera away. At the beginning, there were no handcuffs or abuse, other than defendant "being mean" and telling her what to do. Defendant became increasing abusive, hitting her, using a Taser on her, keeping her from her children and handcuffing her. She had "too many [Taser] marks to count" on her chest and stomach. He "tased" her once while she was tied to a chair.

Defendant taped her to a chair with duct tape and put duct tape over her mouth, making it hard to breathe. On one occasion, she was bent across the chair on her stomach, with her head on the floor. Defendant had intercourse with her while she was bound. She shook her head to indicate that she did not want to, but she could not otherwise protest. He also engaged in anal intercourse with her on some occasions, even though she said she did not want to, because it hurt. Although she sometimes engaged willingly in oral sex, there were times when she did not want to do it, but did anyway so that defendant would not hit her or handcuff her. Defendant would sometimes force her. On one occasion, he sodomized her with a socket wrench.

At one point, defendant cleared the victim's clothes out of the bedroom closet and put a baby mattress on the floor. He would lock her in the closet with a bucket and told her to stay there and not move. He said he was going to have other men come to the

4

house and force her to orally copulate them. He also threatened to sell the videos on YouTube. He threatened to wrap her in a rug and set her on fire. He once threw gasoline on her while she was in the closet. Then he shut her in the closet and left her there for hours. On one occasion, he cut the side of her thigh with a small screwdriver.

At one point, the victim asked defendant to let her kill herself. He tied a rope around her neck and had her stand on a bucket. He kicked the bucket away and let her hang while he was holding the rope. The rope cut her neck.

The victim did not have a key to the couple's apartment. Defendant screwed the front door closed to keep people from coming in. He also added locks to the door. There was also a surveillance camera in the living room.

At least once, defendant hit the victim so hard that she lost consciousness. He revived her by throwing ice on her. On one occasion, he put duct tape on her face, put a wet towel on her face and over her nose, and poured water on her. She could not breathe. Defendant had a device he said was used to strangle a person and threatened to use it on her, to frighten her. He never used it, however.

On August 21, 2013, the victim was late getting the oldest child ready for school. Defendant smacked her with his hand on the back of her head. She then got the middle child ready for school. The defendant took that child to school; the oldest one stayed home. Before defendant left, he hit the victim on the back of the head again and said he would "beat the shit" out of her. However, when he left, he left the door unlocked. She ran to a neighbor's apartment with the two children and called the police. The neighbor said that the victim appeared "petrified." While she was on the phone with the police,

5

she could hear defendant shouting because he could not find her. She had multiple bruises on her face from prior incidents.

The police officer who responded first spoke to the victim and observed her injuries, including burn marks on her stomach. He then entered the couple's apartment. He found a Taser in a drawer in the bedroom, a baggie of methamphetamine in a tool box and handcuffs on the bedroom floor. He also observed a live feed from a camera in the living room, being shown on a television screen. He saw a toddler bed in the closet and observed that the closet locked from the outside.

Detectives who arrived later spoke to the victim and observed that she was extremely thin[2] and had multiple cuts, bruises and abrasions in various stages of healing, and Taser marks on her stomach. In the couple's apartment, the detectives found a strangulation device and handcuffs in the bedroom, a bag of methamphetamine and a methamphetamine pipe, a rope and a gasoline can. They also found several digital flash drives containing videos of various sexual acts.

Thirteen videos were played for the jury. A transcript of the conversations heard on the videos was provided to the jury and admitted into evidence.

In one of the videos, defendant said to the camera, "The reality of it is, is yes, if she does anything stupid I will kill her. Number two, she thinks that camera's a joke. [Its purpose] is to show you, when you fuck with the wrong person, husband, wife, child . . . you do the wrong things, there's a consequence sooner or later in life."

---

[2] On August 21, 2013, the victim weighed 82 pounds.

6

At another point, he said, "[I]t was her choice.  She chose this okay um . . . she has bruises all over her legs.  I did that.  I did that because I tied her ass up, I beat the shit out of her, I tased her.  I fucked her in the ass and I did everything I fuckin' wanted to do and I could have done more because she's a bitch."  He told the victim that he was recording the session for YouTube, but "[n]ot the rape, not any of that."  He told his "audience" that the victim "may not die" that day, "but you will see what a hostage can and will go through.  There's torture, pain, tape, chains, uh knives, needles, water . . . a lot of things that . . . a person can use to start getting to somebody."  He later told her that if she continued to lie to him, he would put her murder on YouTube.

<u>LEGAL ANALYSIS</u>

1.

THE COURT WAS NOT REQUIRED TO HOLD A *MARSDEN* HEARING BASED ON STATEMENTS DEFENDANT MADE DURING A *FARETTA*[3] HEARING

A court is required to hold a hearing into a defendant's complaint that his court-appointed attorney is not providing competent representation whenever the defendant clearly indicates that he is seeking substitution of counsel.  (*Marsden*, *supra*, 2 Cal.3d at p. 123; *People v. Valdez* (2004) 32 Cal.4th 73, 97; *People v. Lucky* (1988) 45 Cal.3d 259, 281 & fn. 8.)  Defendant contends that because he expressed dissatisfaction with his attorney during a hearing on his request to represent himself, the trial court was obliged to conduct a *Marsden* hearing.  As we discuss, however, defendant made it clear during

---

[3] *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

7

that hearing that he was not seeking substitution of counsel but wanted to represent himself. Accordingly, the court had no duty to conduct a *Marsden* hearing.

The issue arose as follows: On April 10, 2014, the trial court commenced a *Marsden* hearing based on its understanding that defendant wanted a new attorney. However, defendant explained to the court that he was not seeking a new attorney. What he wanted was to have his "conflict answered." He did not elaborate as to what that meant. Because defendant stated unequivocally that he did not want a new attorney, the court concluded the hearing.

On November 21, 2014, the court again convened a *Marsden* hearing. The court stated that it had received a "conflict of interest and complaint letter." In the letter, defendant stated that he wanted his public defender, Michael Mendoza, dismissed for incompetence. Defendant stated that Mr. Mendoza was not communicating with him, that he had breached defendant's direction not to negotiate with the district attorney, that he had failed to retrieve evidence defendant wanted him to obtain, that he had failed to file a *Pitchess*[4] motion, and that he had failed to ensure a hearing on the record of a motion, filed by defendant personally, seeking to set aside the information pursuant to section 995. The court listened to defendant's grievances, obtained counsel's explanations for his actions and inactions, and determined that defendant had failed to show incompetence by Mr. Mendoza. Accordingly, it denied the motion.

---

[4] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, superseded by Penal Code section 832.5 et seq. and Evidence Code sections 1043 and 1045, as stated in *Long Beach Police Officers Assn. v. City of Long Beach* (2014) 59 Cal.4th 59, 67-68.

8

On December 5, 2014, defendant made a request to represent himself, pursuant to *Faretta*, *supra*, 422 U.S. 806. After the court explained to defendant the pitfalls of self-representation, the court asked defendant if he still wanted to represent himself. Defendant replied, "I do, but it's not willingly." He explained that he felt compelled to represent himself because he was being held against his will and because "the representation that I've been receiving from Mendoza is from the state, who is also prosecuting me." The court agreed to let defendant represent himself if he signed a waiver. Defendant refused to do so. After a consultation with Mr. Mendoza, defendant was given permission to address the court. This was done off the record.

The following court day, the court revisited defendant's request for self-representation and explained again that the court could not allow him to do so unless defendant gave an unequivocal waiver. The court explained various reasons, apart from lack of an unequivocal waiver, that would justify denial of the motion. The court then asked defendant if he was satisfied with having counsel represent him. Defendant replied, "Absolutely not." He explained again that he was forced to represent himself because he was being held against his will. He said that he was dissatisfied with Mr. Mendoza's representation, but that he had "already had [a] *Marsden* hearing trying to fire him and that hasn't solved nothing." He said, "I feel I'm forced when I do not wish to participate in what's taking place in this courtroom, which I feel is fraud under Article 3, Section 2, 1217 [*sic*] of the constitution where only common law or military tribunal venue is allowed in this courtroom. I do not want to participate in the fraud, at all. I understand what's taking place in this courtroom and I do not accept it whatsoever. And

9

there is no one on my side and understanding what's going on in this courtroom but me. I'm sure you may understand what's taking place, which is why I asked the District Attorney to provide some form of jurisdiction to show that she has the right to bring this claim to this courtroom and to continue to proceed in this process."[5]

After further discussion, during which the court suggested that an evaluation of defendant's competency to represent himself might be in order, the court again found that defendant had not unequivocally asked to represent himself and had not waived his right

---

[5] We infer that defendant was referring to Article III, section 2, of the United States Constitution. Article III, in pertinent part, provides:

"Section 1. The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

"Section 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;— between a State and Citizens of another State,—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

"In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

"The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed."

to counsel.  The court asked defense counsel to look into the possibility of requesting the evaluation and continued the proceeding to the following day.

The next day, defendant reiterated his concern about the court's legitimacy "consistent with the constitution of the Supreme Court ruling" that he had referred to previously, i.e., "Article 1, section 8, clause 17."[6]  He asked, "What's taking place in this courtroom, common law or admiralty military tribunal venue?  And I would like to be told which is taking place."  The court asked counsel if he understood what defendant was talking about.  Counsel explained that defendant doubted the trial court's jurisdiction and the district attorney's authority to represent the People of the State of California.  The court responded that it had already ruled on that issue when defendant raised it in his section 995 motion, and informed defendant that he could raise the issue by writ or on appeal, but that the issue was decided for purposes of his trial.

The court then returned to the question of self-representation.  The court stated that the only issue defendant had mentioned with respect to his attorney was that Mr. Mendoza refused to make certain statements when defendant wanted him to.  The

---

[6]  Defendant previously referred to Article III, section 2, of the United States Constitution.

Article I of the United States Constitution enumerates the powers of Congress; section 8, clause 17 authorizes Congress to exercise exclusive legislation over the seat of government of the United States, i.e., Washington, D.C., and to exercise like authority over all places purchased for the erection of forts, magazines, arsenals, dockyards and other needful buildings.

Article I, section 8 of the California Constitution provides:  "A person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin."  It does not have a clause 17.  Accordingly, we do not know what defendant meant by this statement.

court had previously explained to defendant that counsel knew when a particular statement was or was not appropriate, depending upon the specific issue the court was dealing with at any particular time. Defense counsel explained that the statements defendant wanted him to make were the ones defendant had just made, i.e., concerning the court's authority under Article III of the United States Constitution and concerning the district attorney's authority to try him, and that if he did not make those statements when defendant wanted him to, defendant would just make them on his own. Defendant had been removed from a prior hearing for doing so. After discussion of the limitations on an incarcerated self-represented defendant's ability to prepare for trial and the court's refusal to release him on his own recognizance, defendant concluded that it would be in his best interest to have Mr. Mendoza represent him. It was against his will, he said, but he had no choice. Based on those statements, the court concluded that defendant was not seeking self-representation.

Nowhere in any of these hearings on self-representation did defendant ask for another attorney to replace Mr. Mendoza or clearly indicate that he wanted a new attorney. The mere mention of dissatisfaction with current counsel during a *Faretta* hearing is not sufficient to trigger the court's duty to hold a *Marsden* hearing. (*People v. Mendoza* (2000) 24 Cal.4th 130, 156-157.) Accordingly, we reject defendant's contention.

2.

## DEFENDANT DID NOT OBJECT TO EVIDENCE ON THE

## GROUNDS HE ASSERTS ON APPEAL

The victim's sister and father both testified for the prosecution regarding their observations of defendant's relationship with the victim. Defendant now contends that their testimony was inadmissible on several grounds: That it was improper evidence of prior crimes; that it was irrelevant; that it was improper character evidence and not admissible as evidence of propensity to commit acts of domestic violence as provided by Evidence Code section 1109; and that it should have been excluded under Evidence Code section 352 as more prejudicial than probative.[7]

In order to preserve issues pertaining to the admissibility of evidence for appellate review, the party must make a timely and specific objection on the particular ground he

---

[7] As pertinent here, Evidence Code section 1109, subdivision (a)(1) provides: "(a)(1) Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

13

seeks to raise on appeal. (*People v. Farnam* (2002) 28 Cal.4th 107, 153; see also Evid. Code, § 353.)[8] Here, defendant did not make a pretrial motion to exclude evidence of prior acts of domestic abuse on the grounds he asserts on appeal.[9] Rather, he objected as the evidence came up during the trial. We will examine each objection cited by defendant in turn.

At reporter's transcript page 352, the victim's sister, Josephine, was asked if she had ever seen defendant become violent with the victim. Defense counsel did not object. Josephine answered that on one occasion, defendant became angry with the victim and pulled her off the bed by her feet, causing the victim to fall on the floor. After that question, the court summoned counsel to the bench on a related topic. Defense counsel then said that he had been about to make an objection because it "[s]ounds like we are getting into character evidence, like prior bad acts that [defendant] did." The court agreed that the prosecutor appeared to be getting into character evidence. The prosecutor replied, "I plan to move on." The court responded, "Okay." Defendant did not seek to have the witness's prior answer stricken, nor did he interpose another objection when the prosecutor resumed questioning the witness. Accordingly, defendant's objection on

---

[8] Evidence Code section 353 provides in pertinent part: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion."

[9] Defendant did seek exclusion of his prior conviction for domestic violence. The court overruled his objection. Neither of the two witnesses was asked about the prior conviction.

14

grounds of character evidence was essentially sustained, and no evidentiary error was preserved for appeal.

At reporter's transcript page 361, defense counsel asked for an offer of proof as to what the victim's father, Dwight, would testify to. He alluded to Dwight's potential testimony generally as not relevant, but did not give a reason that he considered it irrelevant. The prosecutor responded that Dwight would testify about his diminishing relationship with the victim because of defendant's interference, and about his observations that the victim's health appeared to be deteriorating during the relevant period of time. The court overruled the objection. Defense counsel did not interpose any objection to the testimony as described in the offer of proof. Accordingly, no evidentiary issue was preserved for review.

At reporter's transcript page 364, defense counsel objected to Dwight's testimony that one of his daughters had told him that she thought defendant was abusing the victim. The ground for objection was hearsay. The court sustained the objection and ordered the answer stricken. At reporter's transcript page 365, cited by defendant in his opening brief, there is no objection.

Because no timely objection to evidence was made and overruled by the court on the grounds defendant asserts on appeal, we need not address his contentions.

3.

DEFENDANT'S CLAIM OF PROSECUTORIAL ERROR OR MISCONDUCT

DURING CLOSING ARGUMENT WAS NOT PRESERVED FOR REVIEW

During her closing argument, the prosecutor stated to the jury that torture is "almost like an umbrella-like crime. It's not necessarily something that happens with one punch, or something that happens with one strangulation, or something that happens with one rape, or one sodomy or one of something. Torture is kind of all-encompassing. And [the victim] talked about it and you see some of the behavior on the videos as well. But it's stuff like when [the victim] describes how the defendant would kind of C-clamp her throat with his hand and hold her up until she got to the point of unconsciousness and he had to splash water on her face to wake her up, coupled with being punched, being kicked, being tased, not having food, being left locked in a closet. It's all of those things, along with the rapes and the sodomy and all of the forcible crimes. It's an umbrella over all of those things." Defendant contends that this is a misstatement of the law and constituted prosecutorial misconduct. Trial counsel did not object, however, apparently preferring to address the prosecutor's remarks in his own argument.

Acknowledging that claims of prosecutorial misconduct are not, as a general rule, preserved for appellate review unless trial counsel makes a contemporaneous objection on the same ground and requests that the jury be admonished to disregard the impropriety (*People v. Samayoa* (1997) 15 Cal.4th 795, 841), defendant contends that the failure to object should be excused because the record demonstrates that an objection would have

16

been futile. He points out that trial counsel lodged at least nine objections during the prosecutor's rebuttal argument and that the trial court overruled all of them.

We disagree that this shows that an objection to a misstatement of the law, if such it was, would have been futile. Defense counsel's first objection was that the prosecutor had misstated the evidence. The trial court implicitly overruled it, saying, "This is argument." However, the court went on to admonish the jury that arguments of counsel are not evidence, thus achieving the objective of the objection. The rest of defense counsel's objections during rebuttal were based on the contention that the prosecutor's rebuttal exceeded the scope of his closing argument and therefore constituted improper rebuttal. The court overruled them based on the court's recollection that in his argument, defense counsel had touched on the matters the prosecutor raised during her rebuttal. This in no way suggests that the court would not have sustained an objection to a misstatement of the law. Accordingly, we reject the contention that the prosecutor's alleged misstatement of the law was preserved for review despite trial counsel's failure to object.

We also reject defendant's alternative claim that the failure to object constituted ineffective assistance of trial counsel, in violation of his constitutional trial rights. We cannot address such a claim on direct appeal unless the reasons for the challenged act or omission appear on the record or there simply could be no rational tactical basis for counsel's conduct. (*People v. Pope* (1979) 23 Cal.3d 412, 422.) Defendant argues that counsel could not have had a rational tactical reason for failing to object. We disagree. If counsel had objected and the court had sustained his objection, at most the court would

17

have referred the jurors to the instruction and told them that they must follow the court's instructions on the law rather than any conflicting argument by counsel. Instead, counsel countered the prosecutor's description of the law of torture by discussing the instruction defining torture and explaining to the jury why the prosecutor was incorrect. Indeed, he argued that the prosecutor was trying to "bamboozle" them with her argument. We cannot say as a matter of law that this was not a rational tactical choice. Accordingly, the claim of ineffective assistance of counsel fails.

4.

SECTION 654 PRECLUDES IMPOSITION OF AN

UNSTAYED SENTENCE ON COUNT 3

Defendant contends that section 654 precludes imposition of sentence on both count 1 and count 3, for torture and corporal injury to a spouse, respectively.

Section 654 provides, in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." (§ 654, subd. (a).) Section 654 precludes imposition of an unstayed sentence on the count subject to the lesser punishment. (*People v. Mesa* (2012) 54 Cal.4th 191, 195.)

This section has long been interpreted to preclude multiple punishments not only for a single act that violates more than one statute, but for an indivisible course of conduct. (*People v. Beamon* (1973) 8 Cal.3d 625, 639.) "The key inquiry is whether the

18

objective and intent attending more than one crime committed during a continuous course of conduct was the same. [Citation.]" (*People v. Meeks* (2004) 123 Cal.App.4th 695, 704.) "[I]f all of the offenses were merely incident to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once. [Citation.] [¶] If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) Defendant contends that the sentence on count 3 must be stayed because throughout the three-month period in which he inflicted injuries on the victim, he harbored a single intent, i.e., to cause injury to her. Therefore, he reasons, the acts alleged were part of an indivisible course of conduct.

The Attorney General, on the other hand, likens this case to *People v. Perez* (1979) 23 Cal.3d 545 (*Perez*). In that case, the defendant was charged with multiple discrete sexual offenses committed during a single 45- to 60-minute episode. (*Id*. at p. 549.) The California Supreme Court held that it is simplistic to say that the defendant acted with the single intent and objective of achieving sexual pleasure and that to do so would preclude punishment commensurate with the defendant's actual culpability, in that a person who commits an assault consisting of a single sexual offense is less culpable

19

than a person who commits multiple such acts within the course of a single episode. Moreover, each act was separate and distinct and none of the acts was "incidental to or the means by which" another act was committed, nor did any act facilitate the commission of any other act. (*Id*. at pp. 552-554.) Accordingly, the court held, section 654 did not preclude imposition of separate punishments for each sexual act. (*Perez*, at pp. 553-554.) In *People v. Nubla* (1999) 74 Cal.App.4th 719, the Court of Appeal applied *Perez* to multiple acts of violence against a single victim, committed in a single incident. The court held that the defendant could be punished for each count. (*Nubla*, at pp. 730-731.) Based on those two cases, the Attorney General argues that each act of infliction of injury on the victim in this case should be separately punishable under a similar analysis. We disagree that *Perez* and *Nubla* govern this case.

Torture can be committed either by a single act or by a course of conduct. (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1429.) Where torture is tried as a course of conduct crime, it is not necessary that any single act in the course of conduct results in great bodily injury. Rather, if the requisite intent exists and the cumulative result of the course of conduct is great bodily injury, the crime of torture has been committed. (*Ibid*.) This is the theory the prosecutor relied upon in this case.[10] She argued that torture is not necessarily "something that happens with one punch or . . . one strangulation, or . . . one rape, or one sodomy or one of something." She argued that in this case, the torture

---

[10] The information alleged that both count 1 and count 3 took place "on or about August 21, 2013." Nevertheless, the prosecutor made it clear that her theory was that the torture was a three-month course of conduct consisting of multiple acts.

20

consisted of the acts shown on the videos, as well as "how the defendant would kind of C-clamp her throat with his hand and hold her up until she got to the point of unconsciousness and he had to splash water on her face to wake her up, coupled with being punched, being kicked, being tased, not having food, being left locked in a closet. It's all of those things, along with the rapes and the sodomy and all of the forcible crimes. It's an umbrella over all of those things." Because, as the prosecutor argued, the offense of torture by course of conduct consists of multiple discrete acts, all of those acts are the means by which the charged offense was committed. This is different from cases such as *Perez*, *supra*, 23 Cal.3d 545, in which each act, despite being part of a single episode, was separately punishable in part because none of the acts was the means of committing or facilitated the commission of any other offense. (*Id.* at pp. 553-554.) The court also held that this treatment was necessary in order to ensure that the defendant's punishment was commensurate with his actual culpability, i.e., that a person who commits multiple sexual assaults in a single episode is more culpable than a person who commits a single such act. (*Id.* at p. 553.) Here, in contrast, the individual acts, taken all together, *were* the means of committing the charged offense. And, because a conviction for torture results in a term of life imprisonment (§ 206.1), the additional four-year term for corporal injury to a spouse is not necessary to provide punishment commensurate with the defendant's

21

culpability. Accordingly, section 654 precludes imposition of separate sentences on any of the acts that were the components of the course of conduct that constituted torture.[11]

The question, then, becomes whether there is any basis for concluding that the offense charged in count 3 was *not* a component of the torture course of conduct. Whether a particular offense is part of a course of conduct for purposes of section 654 is a question of fact. (*People v. Coleman* (1989) 48 Cal.3d 112, 162.) In the absence of an explicit ruling by the trial court at sentencing, we infer that the court made the finding appropriate to the sentence it imposed, i.e., either applying section 654 or not applying it. (*People v. Tarris* (2009) 180 Cal.App.4th 612, 626-627.) Here, there was no discussion at sentencing as to whether section 654 applied to count 3. Accordingly, we must affirm the sentence if an implied finding that section 654 does not apply is supported by substantial evidence. (*Tarris*, at pp. 626-627.)

As the basis for count 3, the prosecutor apparently relied on the incident on August 21, 2013, the day the victim finally fled. In that incident, defendant "smacked" the victim on the back of her head because she was late getting one of the children ready for school. Examining the evidence in the light most favorable to the trial court's ruling

---

[11] We have found no cases addressing this issue. In *People v. Martinez* (2005) 125 Cal.App.4th 1035, the court held that the individual offenses committed during a course of conduct torture, including infliction of corporal injury on a spouse in violation of section 273.5, subdivision (a), were not necessarily included offenses of the torture count, either by the elements test or the pleading test. Accordingly, the court held, the defendant could be convicted both of torture and of the individual offenses that made up the course of conduct. (*Martinez*, at pp. 1041-1046.) The court did not, however, address a contention that section 654 precluded imposition of unstayed sentences on any of the constituent offenses.

22

(*People v. Tarris*, *supra*, 180 Cal.App.4th at p. 627), we see no basis for concluding that the final assault was either separated in time from the rest of the acts that constituted torture or was in some other manner distinct from those acts. The victim testified to a lengthy series of physical assaults, and there was no evidence that these assaults had ended before August 21. The victim testified that over several months, defendant hit her for many reasons, including not doing what he wanted her to do. On August 21, the victim still had healing injuries on her face from prior beatings. And, the prosecutor specifically argued that the torture consisted of the more serious acts "coupled with" such acts as defendant hitting and punching the victim. Thus, the record supports only the conclusion that this final act of violence was part of the entire course of conduct that constituted torture.

Moreover, as defendant points out, the jury was instructed that as to counts 2, 3, and 4, the prosecution had presented evidence of more than one act that could constitute the offense and that the jury must either unanimously agree as to the specific act that constituted each offense or must unanimously agree that defendant committed all of the acts alleged to have occurred during the relevant time period. The prosecutor's argument was somewhat ambiguous as to whether count 3 was based on the head slap on August 21. She argued as follows:

"Count 3, corporal injury. The defendant willfully inflicted a physical injury on his spouse; the injury inflicted on the defendant [*sic*] resulted in a traumatic condition.

"So what we're talking about there is a punch to the back of the head . . . . You punch someone in the face, now you've got a black eye. That's the traumatic condition

23

or wound that we're talking about. You stab someone in the leg with a screwdriver, now you've got a hole in your leg. *It's any one of those things that she talked about.* The way that it's charged, that corporal injury is specifically going to the date of August 21st when she talked about how he was mad at her because she was not getting the kids ready on time and he hit her in the back of the head, told her he was gonna beat her ass when he got back and she had a big bump on the back of her head on the day that she was beat." (Italics added.)

The final sentence indicates that the prosecutor was relying on the August 21 assault as the basis of count 3. Nevertheless, taken all together, the argument is ambiguous as to whether the jury was required to base its verdict on that act. Based on the prosecutor's argument and the unanimity instruction, the jury could have relied on literally any of the acts the victim described as part of the torture course of conduct to find defendant guilty on count 3. Accordingly, the evidence does not support a finding that the act underlying count 3 was in any manner distinguishable from the acts underlying count 1.

## DISPOSITION

The cause is remanded with directions to modify the sentence to stay imposition of sentence on count 3 pursuant to Penal Code section 654.  The judgment is otherwise affirmed.

CERTIFIED FOR PARTIAL PUBLICATION


McKINSTER
                                                                                        J.

We concur:


HOLLENHORST
            Acting P. J.


SLOUGH
                        J.